UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 21-CV-6665 (RER) (AYS)

———————————

CADARET, GRANT & CO., INC.

VERSUS

GREAT AMERICAN INSURANCE COMPANY

———————————

**MEMORANDUM & ORDER**

———————————

**RAMÓN E. REYES, JR., District Judge:**

Cadaret, Grant & Co. a securities broker-dealer, brings a breach of contract claim against Great American Insurance Company. Plaintiff seeks monetary damages and declaratory relief for alleged losses resulting from a fraudulent scheme carried out by a Cadaret registered representative that involved Cadaret clients. Before the Court are plaintiff's motion for partial summary judgment, and dsfendant's cross-motion for summary judgment. After carefully reviewing the record, and for the reasons set forth herein, Great American Insurance Company's motion is granted, Cadaret's motion is denied, and the case is dismissed.[1]

---

[1] The Court acknowledges and offers its gratitude to Daniel Ruderman, a judicial intern and law graduate of St. John's School of Law, for his assistance in researching and drafting this memorandum and order.

**BACKGROUND**

I. Factual Background

A. Relevant Bond Terms and Exclusions

The following facts are not disputed unless otherwise noted. Cadaret, Grant & Co. ("Plaintiff" or "Cadaret"), a securities broker-dealer, purchased Financial Institution Bond No. FS 0196390 07 00 (the "Bond") from Great American Insurance Company ("Defendant" or "GAIC") for the policy period November 1, 2017, to November 1, 2018. (ECF No. 37, Plaintiff's 56.1 Statement of Facts ("Pl.'s 56.1") ¶¶ 1–2). The relevant section, Insuring Agreement A, provides coverage for "[l]oss resulting directly from dishonest or fraudulent acts committed by an employee . . . with the manifest intent: (1) to cause the Insured to sustain such loss; and (2) to obtain an improper financial benefit for the Employee or another person entity." (Pl.'s 56.1 ¶ 4; ECF No. 51-4 ("Fidelity Bond") at 6–7).

Riders to the Bond define "Employee" to include registered representatives, provide a Single Loss Limit of Liability of $5,000,000 with a $50,000 deductible, and provide a limit of liability of $5,000 for Investigative Claims Expenses with a $1,000 deductible. (Pl.'s 56.1 ¶¶ 5–8; Fidelity Bond at 5–6, 25).

Section 11 defines "Covered Property," as "loss of Property (a) owned by the Insured, (b) held by the Insured in any capacity, or (c) owned or held by someone else under circumstances which make the Insured responsible for the Property prior to the occurrence of the loss." (Pl.'s 56.1 ¶ 9; Fidelity Bond at 21). Section 3 provides that "[t]his bond applies to loss first discovered by the Insured during the Bond Period. Discovery occurs when the Insured first becomes aware of facts which would cause a reasonable

person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred . . . ." (Pl.'s 56.1 ¶ 10; Fidelity Bond at 17).

The Bond contains one relevant exclusion from coverage. Section 2(t) excludes from coverage "damages of any type for which the Insured is legally liable, unless the Insured establishes that the act or acts which gave rise to the damages involved conduct which would have caused a covered loss to the Insured in a similar amount in the absence of such damages." (ECF No. 38-1, Defendant's 56.1 Statement of Facts ("Def.'s 56.1") ¶ 16; Fidelity Bond at 16).

B. Abramovich's 2015 Notice and 2017 Arbitration Demand

Steven Pagartanis worked as a registered representative licensed to sell securities through Plaintiff and as a Cadaret affiliate, as relevant, between September 2012–March 2017.[2] (ECF No. 1 ("Compl.") ¶¶ 17–18; Pl.'s 56.1 ¶¶ 11–13). Pagartanis was an employee of Plaintiff as defined by the Bond. (*See* Pl.'s 56.1 ¶ 5).

In October 2015, Cadaret received what Defendant characterizes as a "notice of a potential claim," and what Cadaret describes as only a "letter," from counsel for Jennifer Abramovich, one of Pagartanis' clients, regarding her accounts and direct investments. (Def.'s 56.1 ¶¶ 22–23; ECF No. 43 ("Pl.'s 56.1 Resp.") at 11–12 ¶¶ 22–23). In February 2017, Abramovich filed with the Financial Industry Regulation Authority ("FINRA") a statement of claim and demand for arbitration against Cadaret, Pagartanis, and another

---

[2] Pagartanis previously contracted with Cadaret for periods of time between August 2002 and 2011. Pl.'s 56.1 ¶¶ 11–13).

3

broker-dealer not relevant to this action. (Def.'s 56.1 ¶ 24). Abramovich alleged losses from her Cadaret mutual fund investments, and that Pagartanis transferred funds from her Cadaret brokerage account to her personal checking account and requested that she write checks payable to "SONESTA HOLDINGS" ("Sonesta") and "KINNICO LAND TRUST" ("Kinnico").[3] (Def.'s 56.1 ¶¶ 25, 26; Pl.'s 56.1 Resp. at 12–14 ¶¶ 25–26). Pagartanis told Abramovich that Sonesta was a boutique hotel chain that would return at least 8% on her investment. (Def.'s 56.1 ¶ 26). Although Pagartanis did not provide written evidence of the existence of either entity, he eventually deposited funds into her accounts. (Def.'s 56.1 ¶¶ 28, 29). However, he refused to provide an accounting of the performance of her investments. (Def.'s 56.1 ¶ 29). At the time of Abramovich's claim, Plaintiff had a comprehensive person report on file dated August 25, 2015, that identified Sonesta as being associated with Pagartanis. (Def.'s 56.1 ¶ 30). Publicly available records on the New York State Department of State's website listed Pagartanis as the CEO and Principal of Sonesta. (Def.'s 56.1 ¶ 31).

Cadaret answered Abramovich's statement of claim in May 2017, stating that the investments in Sonesta and Kinnico "were intentionally concealed from [Cadaret] by Pagartanis." (Def.'s 56.1 ¶¶ 32, 33). It also stated that Pagartanis "intentionally evaded [Cadaret's] detection of his involvement in these investments through deceitful and surreptitious means," that the transactions "were intentionally done off [Cadaret's] books and records by Mr. Pagartanis," and that "Mr. Pagartanis blatantly lied to [Cadaret] about

---

[3] Abramovich's initial investment in Sonesta was a $200,000 check written from her personal account. (Def.'s 56.1 ¶ 25; Pl.'s 56.1 Resp. at 13 ¶ 25).

his activities in an effort to conceal his involvement with Kinnico and Sonesta." (Def.'s 56.1 ¶ 33 (emphasis omitted)).

According to Plaintiff, it did not learn of facts indicating that Pagartanis may have stolen from clients until spring 2018. (Pl.'s 56.1 ¶ 24). Plaintiff alleges that Abramovich's 2017 claim was for losses from legitimate mutual fund investments, and although Abramovich also alleged "selling away" activities into Sonesta and Kinnico, Plaintiff alleges those investments were profitable for Abramovich. (Pl.'s 56.1 ¶ 25). GAIC claims that Plaintiff knew that Pagartanis induced Abramovich to invest in the "two sham companies," in May 2017 after Abramovich filed her statement of claim. (ECF 42-1 ("Def.'s 56.1 Resp.") ¶ 24).

C. Actions Against Pagartanis

The SEC filed a civil complaint against Pagartanis in this District on May 30, 2018, alleging that Pagartanis "defrauded at least nine retail investors of approximately $8 million by soliciting and selling them securities using false and misleading statements from 2013 to at least February 2018" in a Ponzi scheme involving a shell company called "Genesis." (Compl. ¶¶ 25, 26, 27, 31); *Sec. & Exch. Comm'n v. Pagartanis*, No. 18-CV-3150 (RRM) (AKT) (E.D.N.Y.) (Dkt. No. 1).

On July 24, 2018, Pagartanis was indicted for securities fraud, conspiracy to commit mail and wire fraud, conspiracy to commit money laundering, engaging in unlawful monetary transactions, money laundering, and wire fraud. (Pl.'s 56.1 ¶ 15); *United States v. Pagartanis*, No. 18-CR-0374 (JMA) (AKT) (E.D.N.Y.) (Dkt. No. 1). On December 10, 2018, Pagartanis pleaded guilty to conspiracy to commit mail and wire fraud. (Pl.'s 56.1 ¶ 16; ECF No. 51-8 ("Plea Tr.") at 33).

Per Cadarets's description of the mechanics of Pagartanis' "Genesis scheme," he convinced clients to: (1) liquidate funds in their Cadaret brokerage accounts, (2) wire funds from their Cadaret brokerage accounts to their personal bank accounts, and (3) write checks from their personal accounts to sham companies controlled by Pagartanis.[4] (Pl.'s 56.1 ¶ 20).

In 2018, Pagartanis handwrote a note to family members stating "[d]o not offer to pay anyone, let the brokers deal with it." (Pl.'s 56.1 ¶ 26 (emphasis omitted)). GAIC disputes the admissibility of the contents of the note as hearsay because Plaintiff references the note by citation to Pagartanis' sentencing memorandum and not the note itself. (Def.'s 56.1 Resp. at 12–13 ¶ 26).

D. Client Claims and Settlements

In spring 2018, nine Cadaret clients filed claims against Cadaret through the FINRA arbitration program and by written complaint seeking to hold Cadaret responsible for losses sustained in Pagartanis' Genesis scheme. (Pl.'s 56.1 ¶¶ 27, 28). None of the claims proceeded to final hearings, and although Cadaret "disputed its legal liability to clients," it settled all nine claims in mediation, paying a total of $3,301,000. (Pl.'s 56.1 ¶¶ 31–34).

Plaintiff provided notice to Defendant in April 2018 of a potential loss under the Bond and then filed its first interim proof of loss in April 2019 for $2,875,000 to settle four

---

[4] Defendant does not dispute that this "accurately describes some of the general allegations" that third parties made against Pagartanis, however, it does dispute these facts to the extent that Plaintiff offers them for the truth of the allegations. (ECF No. 42-1 ("Def.'s 56.1 Resp.") at 7–8 ¶ 20). Defendant argues that Plaintiff's citation to transcripts in the underlying arbitration proceedings with the third parties involved in Pagartanis' scheme do not establish personal knowledge of the underlying facts. (*Id.*). This distinction does not implicate the Court's decision here.

client claims. (Pl.'s 56.1 ¶¶ 35, 37). Plaintiff then filed three additional proof of loss statements for $103,500, $35,000, and $100,000, respectively, and reported $5,000 in investigative expenses. (Pl.'s 56.1 ¶¶ 38–40). In total, Cadaret submitted interim proofs of loss for a total of $3,118,500.

In April 2021, GAIC denied coverage for the aforementioned losses. (Pl.'s 56.1 ¶ 42).

II.     Procedural History

In December 2021, Plaintiff filed a complaint against Defendant, alleging breach of contract and requesting a declaratory judgment that the losses and all future losses resulting from Pagartanis' scheme are covered under the Bond. (Compl. ¶¶ 50–65). GAIC answered in February 2022, raising several affirmative defenses that the complaint is (1) time-barred; (2) barred by the fortuity/known loss doctrines; (3) barred because Cadaret did not comply with the terms and conditions of the Bond, including timely notice and proof of loss, and the claims are not covered; and (4) barred by the Bond exclusions. (ECF No. 11 ("Ans.") at 9–10). After several extensions to complete discovery, the case was reassigned to the undersigned. Plaintiff and Defendant both filed Local Rule 56.1 Statements in conjunction with their premotion conference letters. (ECF Nos. 37, 38, 39). On May 10, 2024, Cadaret then moved for partial summary judgment on liability. (ECF Nos. 50 ("Pl.'s Mot."); 51 ("Pl.'s Mem.")). Defendant opposed and cross-moved for summary judgment on liability and damages. (ECF Nos. 52 ("Def.'s Mot."); 52-1 ("Def.'s Mem.")). Plaintiff opposed Defendant's cross-motion and replied to Defendant's opposition in the same filing. (ECF No. 53 ("Pl.'s Opp.")), and Defendant replied. (ECF No. 54 ("Def.'s Reply")).

## **LEGAL STANDARD**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable jury could find in favor of the nonmoving party. *See Animal Welfare Inst. v. Romero*, 718 F. Supp. 3d 252, 261 (E.D.N.Y. 2024) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *aff'd sub nom. Wildlife Preserves, Inc. v. Romero*, No. 24-776-CV, 2025 WL 2423476 (2d Cir. Aug. 22, 2025). The moving party bears the initial burden of showing a lack of genuine dispute of material fact, and if that burden is met, the opponent must present the court with evidence showing the dispute is ripe for trial. *Id.*; *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009). "A party cannot defeat a motion for summary judgment with mere speculation and conclusory assertions." *Nguedi v. FRB of N.Y.*, 813 Fed. Appx 616, 617 (2d Cir. 2020); *accord Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

## **DISCUSSION**

The "interpretation of an insurance agreement is a question of law." *High Point Design, LLC v. LM Ins. Corp.*, 911 F.3d 89, 93 (2d Cir. 2018). Under New York law,[5] "insurance policies are interpreted according to general rules of contract interpretation." *Olin Corp. v. Am. Home. Assur. Co.*, 704 F.3d 89, 98 (2d Cir. 2012). "Where the provisions of the policy are clear and unambiguous, they must be given their plain and ordinary

---

[5] The parties do not dispute that New York law applies. *See Wausau Bus. Ins. Co. v. Horizon Admin. Servs. LLC*, 803 F. Supp. 2d 209, 214 (E.D.N.Y. 2011).

8

meaning, and courts should refrain from rewriting the agreement." *U.S. Fid. & Guar. Co. v. Annunziata,* 67 N.Y.2d 229, 232 (1986).

Cadaret's third-party losses are not a "direct loss" covered by the Bond. Plaintiff's argument that causation was sufficiently direct because Pagartanis' conduct proximately caused the loss is unavailing under New York law. (Pl.'s Mem. at 16). The New York Court of Appeals differentiated a policy indemnifying against liability that "obligate[s] the insurer to discharge an obligation owed by the insured to another arising from some act of the insured," and employee dishonesty coverage in a fidelity bond where "the insurance is against the loss of property, owned by or belonging to the insured or others, through employee dishonesty." *175 E. 74th Corp. v. Hartford Acc. & Indem. Co.*, 51 N.Y.2d 585, 592–93 (1980) (citation modified). Under employee dishonesty coverage of a fidelity bond, "the policy insures only against loss to the insured sustained through the dishonesty of its employees. It does not contemplate . . . the assertion of a third-party claim." *Id.* at 592. The Bond at issue here indemnifies Plaintiff for "[l]oss resulting *directly* from dishonest or fraudulent acts committed by an employee" and falls into the latter policy contemplated by *175 E. 74th Corp.* (Pl.'s 56.1 ¶ 4 (emphasis added); *see also* Fidelity Bond at 6).

"[D]irect loss" language in fidelity bonds precludes coverage for losses resulting from liability for third-party settlements.[6] *Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co.*

---

[6] The Fifth, Seventh, and Ninth Circuits also follow this principle. *Lynch Props. v. Potomac Ins. Co.,* 140 F.3d 622, 629 (5th Cir. 1998) ("Although employee dishonesty policies may cover the loss of third-party property in the possession of the insured, these policies do not serve as liability insurance to protect employers against tortious acts committed against third-parties by their employees."); *see Universal Mortg. Corp. v. Württembergische Versicherung AG*, 651 F.3d 759, 762 n.1 (7th Cir. 2011) ("Insurance covers the liability of the insureds to a third-party, while fidelity bonding covers the loss of property owned by the

9

*Inc.*, 246 A.D.2d 202, 210 (1st Dept 1998) ("[T]he putative loss to Kidder arises in part from a settlement with third parties, but the settlement was not the direct result of the employee's dishonest conduct; the employee's dishonesty only caused pricing irregularities in the stock, which, themselves, caused losses to the customers, which then led to litigation concluding in settlement."); *but see F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 205 F.3d 66, 76 (2d Cir. 2000) (distinguishing *Kidder* where the bank's loss resulted from an unpaid loan it would not have issued in the absence of fraud committed by the bank's employee).

In *Kidder*, although the court noted that "direct loss for insurance purposes has been analogized with proximate cause," it declined to extend coverage to settlements with third parties, reasoning that to do so "would create the potential for almost any loss, not initially direct to the insureds, to become a direct loss, a subterfuge that would render the exclusion in this case clearly meaningless." *Kidder, Peabody & Co. Inc.*, 246 A.D.2d at 209–10.

Here, as in *Kidder*, Cadaret's loss (third-party settlements) due to Pagartanis' scheme that embezzled customer's funds from their personal bank accounts is not a direct loss under the Bond. *Id.* ("[T]he insureds' replacement of funds embezzled by the employee from a customer's separate personal bank account maintained by another institution was not a direct loss to the insureds."); *see Drexel Burnham Lambert Grp., Inc.*

---

insureds or held by the insured, as a consequence of employee dishonesty."); *see also Vons Companies, Inc. v. Federal Ins. Co.*, 212 F.3d 489, 491 (9th Cir. 2000) ("Under the insuring clauses, [Plaintiff] is covered only for direct losses to [Plaintiff] caused by its employee's dishonesty, not for vicarious liability for losses suffered by others arising from its employee's tortious conduct.").

10

*v. Vigilant Ins. Co.*, 595 N.Y.S.2d 999, 1007 (N.Y. Sup. Ct., N.Y. Cnty. 1993) ("The insurance policies here involved are fidelity blanket bonds, not liability insurance policies. They do not purport to defend and indemnify the assured every time a claim is made against it because it may be responsible to others for the acts of its employees. The loss covered is the loss to the insured, not the losses sustained by the outside world.").

Plaintiff's reliance on *New Hampshire Ins. Co. v. MF Glob., Inc.*, 108 A.D.3d 463, 970 N.Y.S.2d 16 (1st Dept 2013) to support its argument that the "loss is 'direct' because it was proximately caused by Pagartanis' conduct" is unconvincing. (Pl.'s Mem. at 11). In *MF Global*, the court reasoned that the employee's unauthorized trades beyond his margin account were a direct cause of MF Global's loss. *MF Global*, 108 A.D.3d at 466. ("[The broker's] trading activity resulted in a near instantaneous shortfall for which MF Global, as a clearing member, was automatically and directly responsible."). As a broker and clearing member of the Chicago Mercantile Exchange ("CME"), MF Global assumed complete responsibility for the financial obligations of CME trades made by individual traders and had to settle with the CME Clearing House all losses on trades made through MF Global. *Id.* at 464. There, the non-party broker traded commodities futures from his personal trading account using MF Global's trading system and entered into a large number of sell contracts that exceeded his margin credit. *Id.* at 465. The next day the broker liquidated his positions, which sustained a loss of over $141 million. *Id.* As a result, MF Global transferred approximately $150 million to settle the loss with the CME Clearing House. *Id.*

There, the court distinguished *Kidder* as involving a "protracted causal chain" between the employee's dishonest conduct, "which caused pricing irregularities in the

11

stock, which led to losses to investors, which led to litigation, which concluded in a settlement years after the employee's misconduct," from MF Global's payment to the CME that was "not a third-party loss for which MF Global is liable, but rather a direct loss to MF Global under the bonds." *Id.* at 466–67. Here, the causal chain is similarly protracted as the causal chain in *Kidder*—Pagartanis' conduct led to clients withdrawing funds from Plaintiff to their personal checking accounts, transferring those funds to entities Pagartanis controlled, which led to losses to clients, which led to mediation, which concluded in settlements Cadaret paid years after Pagartanis' conduct. Thus, Plaintiff's third-party loss is not a "direct loss" contemplated by or covered under the Bond.

Cadaret's reliance on *First Defiance Financial Corp. v. Progressive Cas. Ins. Co.*, 688 F.3d 265 (6th Cir. 2012) in support of its argument that the money Pagartanis took from clients' personal bank accounts constituted covered property under section 11(c) likewise falls short. The plaintiff's Fidelity Bond in that case included the same covered property term as section 11(c). (Fidelity Bond at 21 (covered property includes "loss of Property owned or held by someone else under circumstances which make the Insured responsible for the Property prior to the occurrence of the loss.")); *First Defiance*, 688 F.3d at 268 (same). In *First Defiance*, a registered representative transferred client assets that were held in a custodian bank's "individual accounts accessible only to First Defiance's investment advisors" into his own bank account. *First Defiance*, 688 F.3d at 267. The Sixth Circuit reasoned that at the time of the theft the client funds were "owned and held by" the custodian bank under the terms of the bond because the custodian bank "owned the assets and held them for First Defiance's clients." *Id.* at 268. First Defiance

was "responsible" under the bond for these discretionary accounts because First Defiance "had authority over them . . . [and] owed a fiduciary duty to their clients." *Id.*

The matter before this Court differs in two important respects. First, the client funds were held in clients' personal bank accounts at the time of the theft, not in any entity connected to Cadaret or accessible by Cadaret's advisors, including Pagartanis. Second, although Plaintiff owed a fiduciary duty to clients with assets in Cadaret accounts, Plaintiff was not responsible for the funds once they were withdrawn from Cadaret's accounts. In fact, in Plaintiff's own undisputed words, "[i]t could not have been more clear to [the claimants] that Cadaret had nothing to do with" the clients' investments in Pagartanis' scheme. (Def.'s 56.1 ¶ 62; Pl.'s Resp. at 29 ¶ 62).

Further, the express language of exclusion section 2(t) excludes coverage for "damages of any type for which the Insured is legally liable, unless the Insured establishes that the act or acts which gave rise to the damages involved conduct which would have caused a covered loss to the Insured in a similar amount in the absence of such damages." (Def.'s 56.1 ¶ 16). This language reinforces the intention of the Bond that only Plaintiff's direct losses would be covered by expressly excluding coverage for indirect losses due to legal liability similar to the one at issue here, payment of settlements to third parties in anticipation of potential legal liability.

Cadaret's argument that section 2(t)'s exclusion does not bar its claim because it would have sustained the same loss had it reimbursed clients absent the settlements misinterprets the Bond language. (Pl.'s Opp. at 17). The exception to the exclusion concerns conduct that would have caused a covered loss absent legal liability, not whether Cadaret would have paid the same cost if it had reimbursed the clients involved

13

in the scheme absent the threat of legal liability. Plaintiff would need to establish that Pagartanis' theft of personal client funds constitutes a covered loss under the Bond absent the settlement payment, something it cannot do under New York's interpretation of "direct loss" fidelity bond coverage. As Defendant aptly argues, "[i]n the absence of [third-party] liability . . . [Plaintiff] would not have any loss whatsoever." (Def.'s Reply at 7.)

Accordingly, under the plain and unambiguous terms of the Bond, Plaintiff's settlement payments to clients involved in Pagartanis' scheme do not constitute a direct loss under the Bond.

## **CONCLUSION**

For the reasons set forth above, GAIC's motion for summary judgment is GRANTED and Cadaret's motion for partial summary judgment is DENIED. The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Hon. Ramón E. Reyes, Jr. Digitally signed by Hon. Ramón E. Reyes, Jr.
Date: 2025.09.23 12:20:38 -04'00'

_____
RAMÓN E. REYES, JR.
United States District Judge

Dated: September 23, 2025
      Brooklyn, New York